# In the United States Court of Federal Claims
## No. 15-873C

(Filed Under Seal: September 9, 2015)
(Reissued: September 16, 2015)

| | |
|---|---|
| PER AARSLEFF A/S, ) | Pre-award bid protest of a bridge contract planned after a competitively awarded contract was enjoined; justification and approval for sole-source award; standing; motion for preliminary injunction; equitable factors; absence of immediate irreparable injury |
| Plaintiff, ) | |
| v. ) | |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| GREENLAND CONTRACTORS I/S and EXELIS SERVICES A/S, ) | |
| Defendant-Intervenors. ) | |

Paul A. Debolt, Venable LLP, Washington, D.C. for plaintiff Per Aarsleff A/S.  With Mr. Debolt on the briefs and at the hearing were James Y. Boland and Christina K. Scopin, Venable LLP, Tysons Corner, Virginia.

William P. Rayel, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant United States.  With Mr. Rayel at the hearing was Lieutenant Colonel Aaron Lake, United States Air Force.  With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., Robert E. Kirschman, Jr., Director, and Scott D. Austin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

James J. McCullough, Fried, Frank, Harris, Shriver, & Jacobson LLP, Washington, D.C. for defendant-intervenor Greenland Contractors I/S.  With Mr. McCullough on the briefs and at the hearing were Michael J. Anstett and Aaron T. Tucker, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C.  With him on the briefs was Samuel W. Jack, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C.

Kevin P. Connelly, Vedder Price P.C., Washington, D.C. for defendant-intervenor Exelis Services A/S.  With Mr. Connelly on the briefs were Kelly E. Buroker and Caroline A. Keller, Vedder Price P.C., Washington, D.C.

**OPINION AND ORDER**[1]

LETTOW, Judge.

This pre-award bid protest of a planned bridge contract has its origin in a prior post-award protest addressed by this court in *Per Aarsleff A/S v. United States*, 121 Fed. Cl. 603 (2015), *appeals docketed*, Nos. 2015-5111, 2015-5112, 2015-5135, 2015-5143 (Fed. Cir.). In this further protest, plaintiff Per Aarsleff A/S challenges the decision of the Air Force Space Command ("Air Force" or "government") to award a sole-source bridge contract to Greenland Contractors I/S ("Greenland Contractors") and effectively extend Greenland Contractors' existing contract to maintain and support Thule Air Base ("Thule"), an Air Force base in a remote area of northwestern Greenland.  In the prior protest, this court had enjoined a new, competitively awarded contract to Exelis Services A/S ("Exelis Services") for the same services. After the injunction in the prior protest was issued, the Air Force entered a justification and approval for other than full and open competition under the Competition in Contracting Act ("CICA"), specifically, 10 U.S.C. § 2304(c)(2), determining that there was an "unusual and compelling urgency" to continue Greenland Contractors' services at Thule beyond the expiration of its extant contract on September 30, 2015, and projecting an award of the bridge contract to achieve that result.

The protestor, Per Aarsleff, argues that the Air Force's decision to award a bridge contract to Greenland Contractors was arbitrary, capricious, and unlawful because any "unusual and compelling urgency" with regard to services at Thule was caused by the Air Force's failure to award the new contract to Per Aarsleff—the next offeror in line under the solicitation after this court enjoined the award to Exelis Services.  Per Aarsleff also contends that, to the extent the contract with Greenland Contractors needs to be extended beyond September 30, 2015 to allow a transition with Per Aarsleff, such an extension could be achieved through less restrictive means by exercising a six-month option to extend the existing contract under a Federal Acquisition Regulation, 48 C.F.R. ("FAR") § 52.217-8.  By deciding instead to award a one-year bridge contract to Greenland Contractors, with a possible further one-year extension, Per Aarsleff asserts that the Air Force has breached its duty to fairly and honestly consider Per Aarsleff's offer under the still existing and effective solicitation for the requisite services.

Per Aarsleff has moved for a preliminary injunction against the award of a bridge contract to Greenland Contractors.  This motion has been fully briefed on an expedited basis and was addressed at a hearing held on August 28, 2015.  The court has concluded that the requested preliminary injunction should be denied on the ground that there is no immediate irreparable

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective orders entered in this case and in the prior consolidated cases, it was initially filed under seal.  The parties were requested to review this order and to provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by brackets enclosing asterisks, *i.e.*, "[***]".

injury to Per Aarsleff, but that this result does not preclude Per Aarsleff from making a showing as events unfold that it is entitled to temporary or permanent injunctive relief in the future.

**FACTS**[2]

A. *The Earlier Solicitation*

1. *History and background of Thule Air Base.*

Thule Air Base is sited in an austere area of northwestern Greenland, 600 miles north of the Arctic Circle and 900 miles south of the North Pole. *See Per Aarsleff*, 121 Fed. Cl. at 607. Thule's strategic military mission is to "provide early warning and attack assessment of ballistic missile launches, provide space surveillance data and provide tracking, telemetry and command[] . . . of earth orbiting satellite vehicles." *Id.* at 607-08. Thule also supports Canadian and Danish Arctic military outposts and weather stations, as well as "Arctic research operations conducted by agencies of the United States, foreign governments, academia, and private entities." *Id.* at 608. All personnel supporting Thule (700 to 900 individuals) live within the Thule Defense Area, which lacks paved roads and amenities common on most military installations, such as banks, a commissary, and fast food chains. *Id.*

Profound logistical challenges arise with supplying fuel, materials, and non-perishable items to Thule due to its remote location and extreme weather conditions. *See Per Aarsleff*, 121 Fed. Cl. at 607-08. The closest village, Qaanaaq (population 700), is located 75 miles away, reachable by helicopter or dog sled or by boat during the summer. *Id.* at 608. The seaport at Thule is "only available during several summer months; for the remaining months, airlift is the sole type of transportation to and from the base." *Id.* There is no sunlight between November and January, and the temperature during the winter months averages from 0 to -30 degrees Fahrenheit, occasionally dropping to -75 degrees Fahrenheit with wind chill. *Id.* at 607. The "storm season" involving the most extreme weather conditions occurs from September 15 through May 15. *Id.*

The governments of the United States and Denmark established Thule under their 1951 Defense of Greenland Agreement to support mutual defense arrangements under the North Atlantic Treaty Organization. *See Per Aarsleff*, 121 Fed. Cl. at 608.[3] "[T]he Air Force is permitted rent-free use of the land" for Thule. *Id.* In 1962, the U.S. State Department prepared an Aide Memoire to explicate the 1951 bilateral agreement with Denmark, most notably

_____

[2]The recitation of facts is drawn from the supplemental record submitted in this case pursuant to RCFC 52.1(a) and the findings of fact set out in the prior decision in *Per Aarsleff*, 121 Fed. Cl. at 607-20. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (noting that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]Greenland is a self-governing entity of the Danish government, although foreign policy and defense issues are entirely reserved to the Kingdom of Denmark. *See Per Aarsleff*, 121 Fed. Cl. at 608.

emphasizing that the two governments intended "to allow Danish concerns to participate more fully in the operation of support at Thule Air Base." *Id.* at 609.  In 1991, the U.S. and Danish governments issued a Memorandum of Understanding ("MOU") relating to contracts for goods and services in Greenland, providing that both parties "may procure directly from *any U.S. or Danish/Greenlandic source*." *Id.* (emphasis added) (citation omitted).  A Diplomatic Note adopted in 2009 amended the 1991 MOU and required instead that the parties "procure *directly from Danish/Greenlandic sources*" unless "procurement from such sources is not feasible." *Id.* (emphasis added).  The 2009 Diplomatic Note also ensured that the 1991 MOU would be recognized as a binding international agreement.  *Id.*

    2.    *The Air Force's competitive solicitation for maintenance and operational services at Thule.*

Greenland Contractors has been the incumbent contractor for services at Thule since 1972.  *See Per Aarsleff*, 121 Fed. Cl. at 615.  In early 2013, the Air Force began preparations to solicit a new contract to continue base maintenance and operational services at Thule beyond the expiration of the existing contract with Greenland Contractors on September 30, 2015.  *Id.* at 609.  Mindful of the pertinent international agreement, U.S. and Danish officials held discussions about criteria for offerors to be eligible "as 'Danish/Greenlandic sources' for the purpose of a Thule Air Base solicitation." *Id.*   In December 2013, the officials settled on eligibility criteria that required offerors to (1) "produce a signed letter from an officer of a bank within Denmark verifying that the company conducts business with that institution," and (2) "submit a corporate certificate verifying that the company is registered as a business in Denmark." *Id.* at 611.

The Air Force issued a draft solicitation in December 2013 reflecting these eligibility criteria.  *See Per Aarsleff*, 121 Fed. Cl. at 611-12 ("The registered office of the enterprise shall be in the Kingdom of Denmark and shall not be registered as a subsidiary of a foreign company.") (capitals omitted).  Prospective offerors asked the Air Force for clarification about what it meant to "not be registered" in Denmark as a foreign subsidiary.  *Id.* at 612.  Relying on guidance from an official of the State Department, the Air Force responded that the searchable part of the Danish Central Business Registry (Det Central Virksomhedsregister, or "CVR") included "an information point called 'type of company/virksomhedsform' that has 'subsidiary of foreign company' as a possibility, so there is a way to see if the company is fully registered as Danish or acting as a foreign subsidiary in Denmark." *Id.*  The Air Force responded to other questions seeking clarification about the registration requirement by reiterating the eligibility requirements from the draft solicitation.  *Id.*

On March 28, 2014, the Air Force issued the final solicitation as Request for Proposals No. FA2523-12-R-0006 for a contract to be awarded on a low-price, technically acceptable basis. *See Per Aarsleff*, 121 Fed. Cl. at 613.  The eligibility criteria in the Request for Proposals ("RFP") were the same as in the draft solicitation, and the RFP also included a Performance Work Statement ("PWS") that required contractors to "[m]aximize and document contract-related purchases and subcontracts from Danish and Greenlandic sources" and to "document and justify any exceptions." *Id.* at 614-15.  Additionally, on August 5, 2014, the Air Force made an independent query to the Danish Business Authority, which informed the Air Force that it "does not register owners" and therefore the CVR was not an appropriate method to identify foreign

subsidiaries.  *Id.*  Despite this advice that registration as a foreign subsidiary was not possible, the Air Force did not amend the solicitation or its guidance to offerors to address the mistake in the eligibility criteria.  *Id*. at 617.

Four offerors, Exelis Services, Per Aarsleff, Greenland Contractors, and Copenhagen Arctic A/S ("Copenhagen Arctic") submitted timely proposals.  *See Per Aarsleff*, 121 Fed. Cl. at 615.  Although all four offerors were and are Danish-registered enterprises, "Exelis Services is a wholly-owned subsidiary of Vectrus Systems Corporation . . . , a United States-based company." *Id.*  The Air Force was aware of Exelis Services' status as a subsidiary, *id.* at 616, but because Exelis was not "registered" as a "foreign subsidiary" in the CVR, the Air Force concluded that Exelis was eligible for the contract award as a Danish or Greenlandic enterprise, *id.* at 617.

The Air Force ultimately determined that all four offerors were eligible for the contract award and that their proposals were technically acceptable.  *See Per Aarsleff*, 121 Fed. Cl. at 617.  Exelis Services submitted the lowest-priced proposal, followed by Per Aarsleff, Copenhagen Arctic, and Greenland Contractors.  *Id.*  Exelis Services received the award and was expected to "take over operation, maintenance, and support services from Greenland Contractors on October 1, 2015."  *Id.* at 618.

      3.   *Injunction barring the award to Exelis Services.*

Per Aarsleff, Copenhagen Arctic, and Greenland Contractors filed separate protests at the Government Accountability Office ("GAO"), challenging the award to Exelis Services.  *See Per Aarsleff*, 121 Fed. Cl. at 618.[4]  GAO denied the protests, holding that "the Air Force reasonably evaluated Exelis Services' proposal, and reasonably found that Exelis Services was eligible for award under the terms of the solicitation."  *Id.* at 619 (citing *Per Aarsleff*, B-410782, -2, -3, 2015 CPD ¶ 86, 2015 WL 1004252, at *9 (Comp. Gen. Feb. 18, 2015)).  GAO also rejected Greenland Contractors' assertions that the Air Force did not appropriately conduct price evaluations with regard to Exelis Services' proposal.  *Id.*

Following GAO's decision, Per Aarsleff, Greenland Contractors, and Copenhagen Arctic filed separate protests in this court, which were consolidated.  *See Per Aarsleff*, 121 Fed. Cl. at 620.  The court adopted an expedited schedule for the protest because of the importance of the contract at issue and the criticality of the time associated with the planned transition between the contract awardee and Greenland Contractors during the summer months.  *Id.*  A hearing on the merits was held on May 22, 2015.  *Id.*

In its opinion issued on May 28, 2015, this court set aside the Air Force's award of the Thule contract to Exelis Services and enjoined the Air Force from proceeding with the contract. *Per Aarsleff*, 121 Fed. Cl. at 636.  The court found that the government's eligibility requirements were defective and mistaken insofar as whether an enterprise could be "registered as" a foreign

---

    [4]In accord with CICA, the Air Force suspended Exelis Services' performance while the protests were pending at GAO.  *See Per Aarsleff*, 121 Fed. Cl. at 618.  This stay was lifted after the GAO's decision.

subsidiary. *Id.* at 624-25.  There was no way to "register" as a foreign subsidiary in the CVR. The Air Force's mistake had created a latent defect in the solicitation that was not apparent to offerors.  *Id.* at 628-30.  In light of the long-standing agreements between the United States and Denmark, the defective element of the eligibility requirements had to be elided, and the only reasonable interpretation of "SHALL NOT BE REGISTERED AS A SUBSIDIARY OF [A] FOREIGN COMPANY" was that Danish subsidiaries of foreign entities were not eligible for the Thule contract award, regardless of their registration status.  *Id.* at 627.  As a result, the award of the contract to Exelis Services was "arbitrary and capricious and not in accord with federal procurement law."  *Id.* at 630.[5]

In acting on the prior post-award bid protest, the court also rejected arguments by Greenland Contractors and Copenhagen Arctic that the government improperly evaluated the proposals with regard to the PWS requirement that offerors maximize contract-related purchases and subcontracts with Danish/Greenlandic sources.  *Per Aarsleff*, 121 Fed. Cl. at 631-34. Greenland Contractors and Copenhagen Arctic had contended that the Air Force should have disqualified Per Aarsleff's proposal because a [***] work would have been performed by a U.S.-based subcontractor.  *Id.* at 631.  The court found no evidence that any of the proposals were facially deficient with regard to this requirement.  *Id.* at 633-34.[6]

## B.  *The Air Force's Actions Following the Prior Injunction*

Following the court's decision setting aside and enjoining the award to Exelis Services, the Air Force determined it would need to extend the contract with Greenland Contractors and to execute a justification and approval for other than full and open competition to achieve that result.  Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Opp'n") at 4, 9-10, ECF No. 24.  The contracting officer, Mr. King, "anticipated needing to extend Greenland Contractors' performance beyond September 30, 2015, based upon a sole[-]source extension or bridge contract."  Def.'s Opp'n App. (Decl. of Patrick King (May 5, 2015)) ("First King Decl.") at 19, ECF No. 24-1.  The original solicitation had contemplated and provided for an eight-month transition or "phase-in" between February 1, 2015 and September 30, 2015.  AR 20e-777 (RFP

---

[5]Following the award of the Thule contract to Exelis, the Danish government expressed "concerns relating to the interpretation of international agreements between the two governments pertaining to the definition of a Danish/Greenlandic enterprise."  *Per Aarsleff*, 121 Fed. Cl. at 618.  Thereafter, in a Joint Statement issued in March 2015, the U.S. and Danish governments advised that they had established an "expert working group to develop a mutually acceptable definition of a Danish/Greenlandic enterprise," and after the adoption of an agreed definition, the Air Force said it intended to competitively award the Thule maintenance contract based on the new definition.  *Id.*  This statement was "salient evidence that the Air Force committed a fundamental error in awarding the Thule Contract to Exelis Services."  *Id.*

[6]Because the award to Exelis Services was set aside on other grounds, the court declined to rule on Greenland Contractors' contentions that the government "engag[ed] in misleading discussions regarding pricing" and that an allegedly "flawed pricing evaluation left Greenland Contractors' unreasonably high prices uncorrected."  *See id.* at 623.

No. FA2523-12-R006).[7]  This period accounted for a possible contract award to an offeror other than Greenland Contractors as well as the need to conduct the transition during the "port season," when the port at Thule is not frozen and the Air Force can accept equipment and supplies transported by ship.  AR 291-29598 (Justification & Approval for Greenland Contractors Bridge Contract) ("Due to the limited port season[,] a successor contractor would need to perform a thorough on-site evaluation, inspection and inventory of existing contract supplies, materials and equipment in February and March, make purchase decisions in April[,] and arrange for delivery to the Danish and US seaports in June for transport to [Thule] in July prior to taking over full service responsibility.").[8]

At the same time, however, the Air Force kept open the original solicitation, to preserve the option of eventually making an award under that solicitation.  Hr'g Tr. 9:12-16 (Aug. 28, 2015).[9]  On June 10, 2015, the Air Force sent a letter to Per Aarsleff, Copenhagen Arctic, and Greenland Contractors asking each enterprise to extend their offers under the prior solicitation for 220 calendar days, *i.e.*, until January 20, 2016.  AR 280-29468, 281-29470, 282-29472 (Requests to Per Aarsleff, Copenhagen Arctic, and Greenland Contractors to Extend Offers).  All three offerors agreed to the extension on June 11, 2015.  AR 283-29476, 284-29478, 285-29480 (Responses to Requests to Extend Offers).  Exelis Services also contacted the Air Force on June 11, 2015, offering to extend their offer under the prior solicitation for an additional 270 calendar days.  AR 286-29482 (E-Mail from Exelis Regarding Offer).

On June 24, 2015, Mr. King received verbal approval "to begin fact finding with Greenland Contractors regarding the possibility of executing a Bridge Contract for [fiscal year 2016]."  AR 288-29491 (Mem. for Record Regarding Fact Finding with Greenland Contractors).  In the process of drafting a justification and approval for the bridge contract, Mr. King noted that the Air Force could have either "utilize[d] a six-month extension" under the existing contract (pursuant to FAR § 52.217-8) or entered into a bridge contract.  AR 290-29594 (Mem. for the Record in Lieu of Market Research Report (June 26, 2015)).  The Air Force determined that a bridge contract with a six-month basic performance period and six one-month option periods was "the best choice."  *Id.*; *see also* First King Decl. at 10 ("The second, and less preferred, method

---

[7]Citations to the administrative record refer to the record filed in the earlier protest and a supplemental record filed on August 21, 2015 in this subsequent protest.  The record is paginated sequentially and is also divided into tabs.  The record in the earlier protest extends through tab 272, and the record in this subsequent protest runs from tab 272 through tab 307.  In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 20e-777 refers to page 777, which is located in tab 20e of the record.

[8]During the prior protest, the Air Force estimated that if the court enjoined the award to Exelis Services and the Air Force decided to instead award the contract to another awardee, *e.g.*, Per Aarsleff, there could not be a complete transition until January 2016 at the earliest—and more likely not until July 2016—because the "port season" would be nearly over at the time of the contract award (mid-June 2015).  First King Decl. at 11-12.

[9]The date of the hearing on Per Aarsleff's motion will not be reported in subsequent citations to the transcript of that hearing.

of continuing performance with Greenland Contractors is to execute an extension of the existing contract [under FAR § 52.217-8]"). The main reasons the Air Force preferred a bridge contract were (1) "the extreme price difference between Greenland Contractors' existing contract and its competitive proposal," and (2) "the differing requirements between the incumbent contract and the fiscal year . . . 2016 requirements." First King Decl. at 10.

The Justification and Approval for the bridge contract was approved on July 1, 2015. AR 291-29595 (Justification & Approval for Greenland Contractors Bridge Contract). In it, the Air Force invoked the "unusual and compelling urgency" exception to CICA, 10 U.S.C. § 2304(c)(2), which allows agencies to use other than competitive procedures in a procurement when the government would otherwise be seriously injured. The Justification and Approval stated that Greenland Contractors "is the only contractor with resources in place and capable of providing the critical services required at [Thule] without delay or mission impact [beyond September 30, 2015]." AR 291-29598. It also reiterated that the expected "phase-in period" for a new contractor would be six-to-eight months. *Id.*

The Justification and Approval indicated that the period of performance of the bridge contract would be "up to one year . . . which may consist of one 3-month base period with nine 1-month option periods," with a total estimated cost for the twelve-month period of $[***]. AR 291-29596. The Air Force later proposed to change the period of performance to one six-month base period with six one-month option periods. AR 301-29906 (Approval to Use Undefinitized Contract Action); *see also* Def.'s Opp'n at 11 n.3 and App. (Decl. of Patrick King (Aug. 21, 2015) ("Second King Decl.") at 19. After negotiations, Greenland Contractors lowered its not-to-exceed price for this period to approximately $[***]. AR 306-30186-87 (E-Mail from Greenland Contractors with Final Agreed-Upon Not-to-Exceed Amounts (Aug. 6, 2015)); Def.'s Opp'n at 12 (converting Greenland Contractors' offer expressed in Danish kroners (code DKK) to U.S. dollars). By comparison, the total price for Greenland Contractors' performance in fiscal year 2015—which would serve as the basis for a six-month extension under FAR § 52.217-8— was approximately $[***]. AR 279-28718-20 (Contract No. FA2523-05-C-9001 with Greenland Contractors); *see also* Def.'s Opp'n at 12; First King Decl. at 10 (stating the same amount in Danish kroner, DKK [***]).

The planned bridge contract also includes an Extension of Services clause under FAR § 52.217-8 that would allow the Air Force to extend the contract for up to twelve months. AR 295-29718 (Determination and Findings Regarding Inclusion of Options (July 6, 2015)). Because this option period was not included in the evaluation for the award, however, the Air Force would need to complete another justification and approval to exercise the option. *Id.*; *see also* Def.'s Opp'n at 11 n.3. The Air Force posted a redacted version of the Justification and Approval on the Federal Business Opportunities website on August 5, 2015. AR 305-30177 to 84.

Per Aarsleff filed this subsequent protest on August 13, 2015 challenging the Air Force's planned award of the bridge contract to Greenland Contractors. Contemporaneously, Per Aarsleff moved for a preliminary injunction to bar the Air Force from entering into the bridge contract. Pl.'s Mot. for Prelim. Inj. at 1, ECF No. 3. Greenland Contractors moved to intervene on August 13, 2015, and Exelis Services moved to intervene on August 17, 2015; the court granted both motions. Order of Aug. 14, 2015, ECF No. 14; Order of Aug. 18, 2015, ECF No.

18.  The court held an initial conference and hearing on August 18, 2015, followed by submission of the supplemental administrative record, briefing, and a hearing on Per Aarsleff's motion for a preliminary injunction on August 28, 2015.

## JURISDICTION

### A. *28 U.S.C. §1491(b)(1)*

This court has jurisdiction over pre-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)).  In relevant part, the Tucker Act as amended vests this court with juridical power to

> render judgment on an action by an *interested party* objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (emphasis added); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) ("On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.").

### B. *Standing*

Only an "interested party" has standing to challenge the award of a contract in a bid protest.  *See* 28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (internal citation omitted).  In a protest of a sole-source contract award, the protestor can establish direct economic interest by showing prejudice or injury as a result of a violation of a statute, regulation, or procedure.  *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001); *see also Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").

In the context of a *post-award* protest, the disappointed party must show that but for the alleged violation "it would have had a substantial chance of receiving the award."  *Emery Worldwide*, 264 F.3d at 1086; *see also Myers*, 275 F.3d at 1370 ("Thus, in this sole-source procurement, Myers bore the burden of establishing that it had a substantial chance of receiving the awards.").  Conversely, in a *pre-award* bid protest "it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009).  As a result, the Federal Circuit affirmed the use of the "*WinStar* standard" for standing in pre-award protests, "where standing is established by alleging 'a non-trivial competitive injury which can be

redressed by judicial relief.'" *Id.* (citing *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)).

Greenland Contractors argues that Per Aarsleff's pre-award bid protest should be dismissed for lack of standing because Per Aarsleff is not an "interested party" within the definition of 28 U.S.C. § 1491(b)(1). Opp'n of Greenland Contractors I/S to Pl.'s Mot. for Prelim. Inj. ("Opp'n of Greenland Contractors") at 8, ECF No. 26. Greenland Contractors points to the standard in *Myers* that a protestor must establish prejudice, and therefore "direct economic interest," by demonstrating it had a "substantial chance" of receiving the contract in question. *Id.* at 8-9. Greenland Contractors asserts that Per Aarsleff could not have reasonably competed for the services contemplated by the bridge contract because, as of the date of the protest, Per Aarsleff had neither begun nor completed the appropriate transition necessary to fully assume the maintenance and operations responsibilities at Thule. *Id.* at 8-10. Greenland Contractors further argues that Per Aarsleff's alleged injuries are not redressable under the current protest because setting aside the bridge contract "would not actually result in Per Aarsleff receiving anything." *Id.* at 11-13.[10]

These arguments are not persuasive. The original solicitation for the long-term base maintenance and operations contract at Thule is still open, and all the offerors have extended their offers until at least January 20, 2016. AR 283-29476, 284-29478, 285-29480 (Responses to Requests to Extend Offers); AR 286-29482 (E-Mail from Exelis Regarding Offer); *see also* Hr'g Tr. 9:12-16. Contrary to Greenland Contractors' position, Per Aarsleff does not have to prove that it had a "substantial chance" of receiving the bridge contract, but rather that the decision to award the bridge contract caused Per Aarsleff a "non-trivial competitive injury which can be redressed by judicial relief." *See Weeks Marine*, 575 F.3d at 1361. Per Aarsleff has established such an injury by alleging that the Air Force's plan to pursue a bridge contract of lengthy duration improperly circumvents an award of a long-term contract under the original solicitation, causing Per Aarsleff a non-trivial competitive injury.[11]

---

[10]Greenland Contractors raises the issue of redressability in the context of its argument that Per Aarsleff cannot meet the constitutional standing requirements under Article III of the Constitution. Opp'n of Greenland Contractors at 10-11. The Federal Circuit has established that the standing requirements under 28 U.S.C. § 1491(b)(1) "impose more stringent standing requirements than Article III." *Weeks Marine*, 575 F.3d at 1359. Therefore, the court need not reach Greenland Contractors' argument that Per Aarsleff cannot meet Article III standing requirements.

[11]Sole-source awards in federal procurements are generally susceptible to challenge by viable providers of the pertinent services or products who would be in a position to compete for competitive awards under CICA. *See, e.g., Savantage Fin. Servs., Inc. v. United States*, __ Fed. Cl. __, __, No. 14-307C, 2015 WL 5158968, at *19 (Sept. 3, 2015) (standing to challenge acquisition of financial managerial software systems without competition); *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 708 (2013) (contesting modification of an existing contract to supply a named product, that effectively foreclosed providers of other products); *RN Expertise, Inc. v. United States*, 97 Fed. Cl. 460, 466 (2011) (addressing cancellation of a solicitation prior

Greenland Contractors is also incorrect in asserting that Per Aarsleff's injury is not redressable by this court in the present protest. Per Aarsleff is not arguing that it should have been awarded the bridge contract; it is arguing that by deciding to pursue a bridge contract rather than other available alternatives, the Air Force improperly bypassed its obligations to competitively procure services at Thule and breached its duty to fairly consider Per Aarsleff's proposal under the original solicitation. *See* Compl. ¶¶ 9-14. The court has the ability to tailor relief with more particularity than simply enjoining an award of a bridge contract with Greenland Contractors. *See, e.g.*, Hr'g Tr. 59: 3-5 (statement by government counsel that "if it were appropriate, the [c]ourt could enjoin the Air Force from proceeding with options under the bridge contract"). Therefore, Per Aarsleff's complaint that the bridge contract is excessively restrictive on competition is redressable through this protest.

In sum, Per Aarsleff has standing to pursue its claims.

## STANDARDS FOR DECISION

To grant the "extraordinary relief" of preliminarily enjoining a prospective award of a contract before a hearing on the merits of a protest, the court must consider four factors: (1) likelihood of the protestor's success on the merits, (2) irreparable harm to the protestor if an injunction is not granted, (3) whether the balance of hardships tip in movant's favor, and (4) the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also KWV, Inc. v. United States*, 108 Fed. Cl. 448, 455 (2013); *EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 19 (2008). "No one factor, taken individually, is necessarily dispositive." *FMC Corp.*, 3 F.3d at 427. Nonetheless, the protestor must establish the first two factors (likelihood of success on the merits and irreparable harm) before a preliminary injunction can be granted; the other two factors "are not required but are weighed in the balance." *KWV, Inc.*, 108 Fed. Cl. at 455 (citing *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction.")).

## ANALYSIS

### A.  *Per Aarsleff's Likelihood of Success on the Merits*

The court's review of the merits of a bid protest is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). A court may set aside an agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In the context of a bid protest, the court may set aside a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Innovation*

---

to a sole-source award); *Emery Worldwide Airlines, Inc. v. United States*, 49 Fed. Cl. 211, 222-23, *aff'd*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (challenging a sole-source award).

*Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 723 (2013) (discussing this standard in the context of a sole-source procurement).  The protestor must establish "'a clear and prejudicial violation of applicable statutes or regulations.'"  *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Per Aarsleff argues that the Air Force incorrectly determined in its Justification and Approval that there was an "unusual and compelling urgency" for the bridge contract.  Pl.'s Mot. for Prelim. Inj. at 5.  Per Aarsleff notes that the Air Force had another contract vehicle available—the six-month extension of the incumbent contract under FAR § 52.217-8—to cover a short-term need for services at Thule, which would preserve the open, competitive solicitation for the longer-term contract.  *Id.*  Per Aarsleff  contends that even if there was an "unusual and compelling urgency" for services at Thule, the Air Force violated FAR § 6.302-2(c)(2) by pursuing a sole-source bridge contract instead of considering offers from other sources, including Per Aarsleff's offer under the original solicitation.  *Id.* at 5-6 (citing *California Indus. Facilities Res., Inc. v. United States*, 100 Fed. Cl. 404, 410-11 (2011)).[12]  Per Aarsleff supports these contentions by suggesting that the Air Force engaged in "gamesmanship" by not awarding the long-term Thule contract to Per Aarsleff after the court enjoined the award to Exelis Services on May 28, 2015, and instead spending weeks working on the Justification and Approval for the bridge contract.  *Id.* at 7-8.  As a result, Per Aarsleff claims the Justification and Approval violates FAR § 6.301(c), which states that "lack of advance planning" and "concerns related to the amount of funds available" are not sufficient justifications for contracting without full and open competition.  *Id.* at 8-9.

---

[12]FAR § 6.302-2 addresses "[u]nusual and compelling urgency" and cites as authority for its promulgation 10 U.S.C. § 2304(c)(2) or 41 U.S.C. § 3304(a)(2).  *See* FAR § 6.302-2(a).  Paragraph (a)(2) of the Section provides authorization for procurement actions in the absence of full and open competition:

> When the agency's need for the supplies or services is of such an unusual and compelling urgency that the [g]overnment would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

FAR § 6.302-2(a)(2).  Subsection (c) imposes limitations on this authority:

> (c) *Limitations*. (1) Contracts awarded using this authority shall be supported by the written justifications and approvals described in 6.303 and 6.304.  These justifications may be made and approved after contract award when preparation and approval prior to award would unreasonably delay the acquisition.
> (2) This statutory authority requires that agencies shall request offers from as many potential sources as is practicable under the circumstances.

FAR § 6.302-2(c).

Per Aarsleff asserts that if it were to have been awarded the contract in mid-August 2015, it would have "fully anticipate[d] completing transition by December 2015 or January 2016." Pl.'s Mot. for Prelim. Inj. App. (Decl. of Karl Andreassen (Aug. 13, 2015) ("Andreassen Decl."))) at 2. Per Aarsleff indicated that it "can begin mobilization immediately," and that the impending end of the "port season" is not a problem because "Greenland Contractors has already ordered all of the supplies needed for the winter." Andreassen Decl. at 2; *see also* Hr'g Tr. 65:24-25, 66:1-12 (confirmation by counsel for Greenland Contractors that the supply of Thule for the winter has essentially been completed). Per Aarsleff also stated that it "intends to [***]." Andreassen Decl. at 2. However, Per Aarsleff does not dispute that the Air Force must extend Greenland Contractors' existing contract at least until December 2015, to enable a transition with Per Aarsleff to be completed. *See id.* ("We are asking the Court to . . . compel [the Air Force] to use the shorter option period available under the existing incumbent contract, for a period no longer than necessary to effectuate the transition [with Per Aarsleff] (likely no more than three months).").

All parties agree that the Air Force needs to extend its contract with Greenland Contractors beyond September 30, 2015. *See, e.g.*, First King Decl. at 11-12 (estimating that even if the Air Force awarded the Thule contract to Per Aarsleff in mid-June 2015, Per Aarsleff could not assume the full responsibilities until January 2016 the earliest); Andreassen Decl. at 2 (stating that if Per Aarsleff was awarded the contract in mid-August 2015, it could assume full responsibilities in December 2015 or January 2016). Transition time between Greenland Contractors and the new awardee was contemplated in the original solicitation because of Thule's remote location and limited access to the base outside of the summer months. *See Per Aarsleff*, 121 Fed. Cl. at 607-08, 618; *see also* AR 20e-777 (RFP No. FA2523-12-R006) (noting the planned eight-month transition time). Although the Air Force and Greenland Contractors have ensured Thule will be supplied for the winter, any new awardee would still need to assemble the necessary staff and make arrangements to sustain operations before Greenland Contractors could depart. Andreassen Decl. at 2. In this sense, the Air Force's decision to extend its contract with Greenland Contractors to allow for additional transition time is justified.

It is also nonetheless evident that the Air Force did not fully consider all available alternatives before deciding to pursue a bridge contract with Greenland Contractors. Following the injunction of the award to Exelis Services, the Air Force's contracting officer stated that the Air Force considered options for proceeding that included (1) awarding the contract to Per Aarsleff, as the next-lowest-price offer under the prior solicitation, (2) cancelling the solicitation and conducting a new competitive procurement after the United States and Denmark finished developing the new eligibility criteria, or (3) seeking revised proposals under the prior procurement "with or without amending the solicitation." Second King Decl. at 18.[13] If so, any such consideration of those exceptions is not apparent from the Justification and Approval because none of those options is mentioned there. Rather, the main focus of the Air Force's

---

[13]The Air Force could have amended the original solicitation to correct the defect in the eligibility criteria and reopen competition for the long-term contract. This alternative would not have eliminated the need for some extension of Greenland Contractors' existing contract, but it would have addressed some of the uncertainly surrounding future maintenance and operations at Thule.

efforts during the time after the injunction was securing a bridge contract with Greenland Contractors and not preparing for the longer-term provision of services at Thule.

The Air Force points to the pending appeals of the decision in the prior protest as a reason for waiting to address or prepare for a long-term contract. Even with an expedited schedule for the appeals—which none of the five parties to the appellate case had requested as of the hearing on Per Aarsleff's motion for a preliminary injunction on August 28, 2015, *see* Hr'g Tr. 12:21-25, 49:10-13—considerable time will pass before final disposition of the appeals. In short, although the Air Force has established an "unusual and compelling urgency" for a bridge contract of six to eight months' duration, it has not provided a rational basis for a longer term extension.

The likelihood of success is currently in balance. The bridge contract has not yet been awarded and the original solicitation is still open. Several factors important to the merits of this protest are uncertain. The salient dispute is whether, by selecting a contract vehicle with the *potential* for extending the bridge contract for up to two years in lieu of an award under the prior solicitation, the Air Force acted arbitrarily, capriciously, or unlawfully. This question cannot be answered with any assurance in the context of the pending motion for a preliminary injunction.

### B.   *Irreparable Harm to Per Aarsleff*

Per Aarsleff asserts that it "will lose . . . contract revenue[] and . . . profit for each week that it is not transitioning the contract, and more than $[***] per month in revenue, and $[***] in profit [by] not performing the contract [at Thule]." Pl.'s Mot. for Prelim. Inj. at 11. Per Aarsleff also argues that it will also lose the opportunity to fairly compete for the Thule contract under the original solicitation and the "incumbent advantage" of working at Thule while the U.S. and Danish governments work out revised eligibility criteria. *Id.* at 12-13. These arguments are based on the assessment that, without an injunction of the planned bridge contract, "[Per] Aarsleff will not receive a contract this year which, in turn, would mean that [Per] Aarsleff will unlikely receive a contract ever under the current RFP." *Id.* at 12.

These projected harms are largely dependent on an extension of a bridge contract with Greenland Contractors beyond the six-month base period. Since the original solicitation remains open, the Air Force could still award the long-term contract to Per Aarsleff and begin the transition process. Per Aarsleff was neither entitled to immediate award of the contract following this court's prior decision nor has the Air Force's failure to make such an award caused Per Aarsleff irreparable harm. As discussed, immediate award of the contract to the next-in-line offeror was not the government's only alternative; the Air Force could have also amended the solicitation to remove the latent defect in the eligibility criteria and reopened the competition. The fact that the Air Force has not yet pursued an alternative with regard to the long-term contract, and is instead pursuing a bridge contract with the *potential* to extend beyond six months, is understandably of concern to Per Aarsleff. That said, Per Aarsleff has not shown that the Air Force's contemplated bridge contract with Greenland Contractors will cause Per Aarsleff now to suffer irreparable harm in the absence of a preliminary injunction.

C. *Balance of the Hardships*

Per Aarsleff argues that the balance of the hardships weighs in its favor because exercise of a six-month extension of Greenland Contractors' contract under FAR § 52.217-8 would only harm the Air Force insofar as the Air Force would pay higher rates than it would under the lower rates negotiated for a bridge contract. Even so, because the harms claimed by Per Aarsleff are not immediate, Per Aarsleff cannot establish that the balance of hardships currently weighs in its favor.

D. *Public Interest*

Finally, Per Aarsleff argues that a preliminary injunction best serves the public interest because it would uphold the integrity of the procurement process. However, as discussed regarding the preceding factors, the Air Force procurement process remains inchoate with a number of uncertain possibilities. There is no immediate risk to the integrity of the procurement process. Some extension of Greenland Contractors' existing contract is necessary, and the length of the planned bridge contract is indeterminate at this juncture. This factor thus tips in favor of the government, particularly because the relatively reasonable cost of the planned bridge contract also deserves weight.

**CONCLUSION**

For the reasons stated, plaintiff's motion for a preliminary injunction is DENIED, without prejudice to future consideration of motions by Per Aarsleff for temporary or permanent injunctive relief dependent upon events and circumstances yet to occur or that may become evident.

On or before October 2, 2015, the court requests that the parties submit a joint status report that addresses further proceedings in this action.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge